## APPEAL OF SAMUEL HUSTON.

[HUSTON, TO USE, V. CLARK, ET AL.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS NO. 1
OF PHILADELPHIA COUNTY, IN EQUITY.

Argued January 21, 1889—Decided October 7, 1889.

(a) Huston, Clark and Sellers were the owners of nearly all the stock of
a manufacturing corporation which in 1873 was practically insolvent.
Huston had guaranteed a large part of the corporate indebtedness, and all
had made advances to the company, each to an amount over $100,000:

(b) On May 13, 1873, a written agreement was entered into, wherein it
was provided that Huston, in consideration of being indemnified by
Clark and Sellers against all his liability for the debts of the company,
should assign to Clark and Sellers all his stock and the bonds and a note
of the company held by him:

(c) Clark and Sellers agreed to contribute each a like amount with Hus-
ton of the bonds and notes of the company, the fund thus created to be
called the guarantee fund; the surplus that should remain after pay-
ment of the corporate indebtedness, other than that in the guarantee
fund, was to be divided among the parties who had contributed to the
fund:

(d) Although Huston assigned his stock, bonds and note, as agreed upon,
Clark and Sellers did not pay into the guarantee fund the amounts pro-
vided by the agreement, but merely credited themselves with advances
previously made by them to the amount due by them to the fund, and
divided between themselves the bonds assigned by Huston:

(e) Clark and Sellers then took charge of the works of the company and
made fresh advances to the amount of $270,000. Finding, as alleged,
that the business was unsuccessful, they permitted the works to be sold
under legal process of which Huston had notice, bought the property
in, and organized a new corporation.

1. In such case, the advances made by Clark and Sellers prior to the
agreement were debts to be paid by the guarantee fund, and their tak-
ing credit for such advances did Huston no harm. Clark and Sellers
were not the agents of Huston in the subsequent conduct of the busi-
ness, and they were not bound to include him in the purchase and reor-
ganization. Huston, however, was entitled to an account, so that it
could be ascertained if anything were due him from the guarantee fund,
after payment of the company's debts.

Before PAXSON, C. J., STERRETT, CLARK, WILLIAMS, Mc-
COLLUM and MITCHELL, JJ.

No. 138 July Term 1888, Sup. Ct.; court below, No. 373 March Term 1882, C. P. in Equity.

To the number and term of the court below, above stated, Samuel Huston, to the use of Charles P. Perot, assignee for the benefit of creditors, filed a bill in equity against E. W. Clark, William Sellers and John Sellers, Jr., praying for an account, and a decree that so much of the property of the Midvale Steel Company as was purchased or obtained by the defendants by means of the plaintiff's stock, bonds and property assigned to them, should be transferred to the plaintiff, or its money equivalent paid to him.

From the testimony taken before *Mr. Amos Briggs*, examiner and master, it appeared that in 1873 Samuel Huston, E. W. Clark and William & John Sellers were the owners of practically all the stock of the Midvale Steel Works, a corporation organized under the act of July 18, 1863, P. L. (1864) 1102. Huston was president of the company and had advanced to it up to January 1, 1873 about $311,000. In May 1873, the company was practically insolvent, and a large part of its indebtedness had been personally guaranteed by Huston. On May 13, 1873, it appeared that the company owed E. W. Clark $108,910 for advances and William and John Sellers, $121,750 for advances. To other parties it was indebted in the sum of $611,862.

On the date last mentioned, an agreement in writing was entered into between Huston of the one part, and E. W. Clark and William and John Sellers of the other part, which was as follows:

"Whereas: The said party of the first part is liable, as maker of a certain promissory note, made for the accommodation of the Midvale Steel Works, for the sum of twenty thousand dollars, and is also liable upon certain notes endorsed by him, for the accommodation of said works; and Whereas: He has also joined with the parties of the second part in guaranteeing other notes of said works, on terms and in proportions agreed upon between them; and Whereas: These liabilities amount to a large sum, and he, the said party of the first part, may be unable to pay them when the said liability shall become fixed and ascertained; and Whereas: The said party of the first

part is the owner of two thousand and thirty-two shares of the common stock, and two thousand two hundred and eighty-eight shares of the preferred stock of said works, and fifty thousand dollars of its bonds, and also holds a note of said works to the amount of fifty-one thousand five hundred dollars; and Whereas: He has heretofore pledged fifty shares of the stock of the Philadelphia Insurance, Trust and Safe Deposit Company, belonging to him, as security for the said note of twenty thousand dollars, made by him, which is now held by the Fidelity Insurance, Trust and Safe Deposit Company; and Whereas: The said party of the first part has agreed with the said party of the second part that, if they will indemnify him against all debts of the said Midvale Steel Works, he will, on the terms hereinafter mentioned, assign, transfer and set over to said party of the second part, his said stock, bonds and note of the said works, and the said fifty shares of the stock of the Philadelphia Insurance, Trust and Safe Deposit Company, so pledged by him as aforesaid, and all the property pledged by him for said works, or to secure his liabilities for it; and the said parties have agreed to give said guarantee.

" Now the said party of the first part, for and in consideration of the premises, and of the sum of one dollar, to him in hand paid by the said party of the second part, the receipt whereof he acknowledges, and of the covenants hereinafter contained, has assigned, transferred and set over, and does hereby assign, transfer and set over to said party of the second part, all his said above-mentioned stocks, bonds, and note of the said Midvale Steel Works, and the said fifty shares of stock of the Philadelphia Insurance, Trust and Safe Deposit Company, so pledged as aforesaid, and generally all property belonging to him, the said party of the first part, which now is or may be pledged or hypothecated with any creditors of said works, or any person or persons holding any note or notes made, endorsed, or guaranteed by him for the accommodation of said works, to have and to hold the same to them, the said party of the second part, their executors, administrators, and assigns, with full power to sell, pledge, or otherwise dispose of the same in the administration of or settlement of the affairs of said works, or in or for payment or the security of its debts, or any of them, or otherwise, as they, the said party of the second part, may

deem best. And the said parties of the second part, for themselves, their executors, administrators, and assigns, in consideration of said assignment or transfer, and of the premises, do jointly and severally covenant, promise, and agree to and with the party of the first part, his executors, administrators, and assigns, that they now and at all times hereafter forever will save, protect, defend, indemnify, and keep harmless him the said party of the first part, his executors, administrators, from and against all and every of the debts, obligations, or liabilities of the said Midvale Steel Works whatever the same may be, and from and against all suits, claims, actions, causes of action, debts, dues, damages, or demands against him arising out of his relation to or connection with the said steel works, either as president, director, or stockholder or otherwise, or as maker, indorser, or guarantor of any notes of or claims against said works.

" And the said parties of the second part, do for themselves, their executors, administrators, or assigns, jointly and severally covenant and agree, that they will severally contribute a like amount of bonds, notes, and other securities, as Samuel Huston does hereby contribute or agree to contribute; that is to say, that the said William and John Sellers, Jr., as one party or person will contribute fifty thousand dollars in bonds of said company; fifty-one thousand five hundred dollars in notes of the said company; and the said Edward W. Clark will contribute a like amount. And the said William and John Sellers, Jr., as one person or party, and the said Edward W. Clark, will further each contribute stock equal in value to the said stock so heretofore pledged by the party of the first part, to or with the holders of his note, so made as aforesaid, for the accommodation of said company. All of which stock, bonds, and securities, hereby assigned and to be contributed, shall constitute a fund to be called the guarantee fund, for paying the debts of the said works other than the debts constituting or belonging to the said guarantee fund itself. And if after paying the said debts, bonds, notes, or liabilities to others, any surplus shall remain, all securities other than the bonds or notes of said works in or belonging or contributed to the said guarantee fund, shall first be returned or made good in kind or value to the party contributing the same; and if after they shall

be so returned or made good, the parties to this agreement, the said William and John Sellers, Jr., for said purpose being treated as only one person or party, shall divide said surplus between them, in proportion to their several interests in the bonds and notes remaining in said guarantee fund, that is to say, said surplus shall be applied pro rata towards paying the notes and bonds in said fund, contributed by the parties thereto; and if, after paying all the said bonds and notes in or belonging to said fund a surplus shall remain, the same shall be divided among all the stockholders of said works, in proportion to the amount of stock which they may severally hold."

In pursuance of the foregoing agreement, Huston transferred to Clark and William and John Sellers the stocks and securities mentioned therein. The defendants took charge of the works and paid the most pressing debts. They did not transfer, however, to the guarantee fund the securities they were to transfer under the agreement, but merely credited themselves with the advances made by them prior to May 13, 1873, to the amount promised by them to the fund. They also divided Huston's bonds in the guarantee fund and transferred them to their own names. They continued operating the works, and made additional advances to the extent of $270,000. In 1880, the interest on one of outstanding bonds being in arrear, suit was brought on the bond, and judgment obtained against the company. Execution was issued upon the judgment and the property was sold thereon to the defendants for $450,000. The defendants then organized a new company under the name of the Midvale Steel Company. The facts connected with this sale, the plaintiff's notice thereof, and the general conduct of the parties, are stated in the opinion of the Supreme Court.

The master found that owing to a failure to file an annual statement of stocks, assets, etc., as required by §§ 33, 34, act of July 18, 1863, P. L. [1864] 1102, under which the Midvale Steel Works were incorporated, all the stockholders were liable as general partners; that the defendants had no right to appropriate any part of the guarantee fund to the payment of advances previously made by them; that the defendants were acting as agents for Huston under the agreement, and that Huston was entitled to an interest in the Midvale Steel Company coextensive with his interest in the old company at the

time of the sale, and that defendants should account to him accordingly.

To the report of the master, the defendants filed seventy-eight exceptions, which were overruled by the master and being filed with his report were renewed before the court.

On June 9, 1888, the said exceptions having been argued, the court in banc, BIDDLE, J., filed the following opinion:

It appears that previous to May 13, 1873, Mr. Huston had made himself liable for the debts of the Midvale Steel Works to a very large amount, which neither he nor the steel works were able to pay. Under those circumstances he agreed with the defendants that if they would indemnify him against all debts of the Midvale Steel Works, and from all demands against him arising out of his relation to or connection with the said steel works, either as president, director, stockholder, or otherwise, or as maker, endorser, or guarantor of any notes of, or claims against, the said works, he would assign to them certain securities. To this the defendants assented, and on May 13, 1873, an agreement to that effect was reduced to writing. By this writing the defendants were to contribute to a guarantee fund double the amount contributed by the plaintiff, but neither party was to contribute their stock in the steel works to the guarantee fund, the plaintiff's assignment to the defendant of his stock being made solely for the purpose of assuring to them the absolute control of the management of the corporation. The defendants, in the administration or settlement of the affairs of the works, or in payment or security of its debts, or otherwise, were to use the guarantee fund as they might deem best. They were to save the plaintiff harmless from all debts of the steel works, and from all liability incurred by him therefor. If, after the payment of the debts of the steel works any surplus should remain, it was to be applied to make good to the parties contributing the same all securities in the guarantee fund other than the bonds or notes of the works; to return or make good to the parties contributing the same their bonds or notes of said works which had been placed in the guarantee fund; and, finally, to divide any surplus still remaining among the stockholders. Under that agreement the rights and duties of the parties must be deter-

mined and the case decided. The defendants are undoubtedly bound to account under its provisions for the property of the plaintiff placed in their hands. This they allege they have been always ready and willing to do, and the evidence in this case, it seems to us, proves conclusively that all the property which was received by the defendants under the agreement of May 13, 1873, was properly held and used by them and has been fully and correctly accounted for.

This, however, is not the real point in controversy in this case, but the contention arises under an allegation, in which the learned master concurs, that the scope of the agreement is much broader than the effect given to it by the exceptants, and that " the agreement constitutes the defendants agents for Mr. Huston to manage and administer the affairs of the steel works, not merely for themselves, but for the joint account of all the parties to the agreement." It is upon this utterly inadmissible assumption that a most elaborate and ingenious argument has been founded. It is contended that, although the works were subsequently sold under a prior mortgage, bearing date October 1, 1872, covering all its franchises, real estate, and fixtures, after the guarantee fund had become exhausted, and when the company owed the defendants $480,969.17 in excess of their contribution to the guarantee fund of $341,127.52, that Mr. Huston still had some interest in the property after the sale. This mortgage was foreclosed under judicial proceedings instituted in Court of Common Pleas No. 3, after a full advertisement and hearing, with the knowledge of Mr. Huston, and the proceeds distributed under a master, Mr. William Sellers becoming the purchaser for the sum of $450,000.

Mr. Huston certainly contributed nothing to the purchase-money, and there is not a particle of evidence that the purchaser was his agent. They were both stockholders in a corporation whose property was sold under an order of court. This, of course, extinguished the stock of the old company, and wiped out not only the stock and credits of the plaintiff, but the stock and credits of the defendants. They purchased the property with none of these stocks and credits, but with their own cash and bonds in excess of Huston's, after applying as many bonds, or their equivalent in money, as he did, to the debts of the company. We utterly fail to see what possible

interest Mr. Huston has in the new company, or why he is entitled to the same proportion of capital stock of the new company that he held in the old.

As the allegations in the bill, charging fraudulent conspiracy or confederacy, were withdrawn on the argument of the case, we are unable to see anything in it but a very simple business operation, by which the plaintiff has received all the protection the defendants contracted to afford him. The exceptions to the master's report are therefore sustained and the plaintiff's bill dismissed with costs.

A final decree having been entered, the plaintiff took this appeal, assigning as error, in eighty-one several assignments, the decree sustaining the defendants' exceptions to the master's report and dismissing the plaintiff's bill.

*Mr. A. T. Freedley*, for the appellant.

*Mr. Geo. M. Dallas* and *Mr. John G. Johnson* (with them *Mr. Geo. L. Crawford*), for the appellees:

OPINION, MR. JUSTICE MITCHELL:

Owing to the number of the exceptions to the report of the master, and the brevity of the opinion of the court below, sustaining them as a whole without separate consideration, this case is presented in the form of a review of the master's report rather than of the judgment of the court itself. But a detailed consideration of the eighty-one assignments of error, or even an attempt to classify them, would be tedious and unprofitable, and we therefore prefer to present our view of the whole case, in the natural order of the substantial questions raised.

1. We proceed therefore to consider, first, *the parties and the situation.*

The parties were the owners of practically the whole stock of the Midvale Steel Works, and had made advances to carry on its operations which had been unsuccessful. Appellant was the president of the company and had advanced a very large portion of his private fortune to sustain it. The other parties had also made advances, but not nearly to the same extent, either in actual amount or in proportion to their other

means. It is not shown that there was any duty to make these advances, or that they were not entirely voluntary. The questions therefore of the relative amounts advanced by the different parties, and by whose fault such advances were made necessary, discussed before the master, are not of any importance. Nor, in view of the subsequent agreement is it at all material whether or not there was any express promise of contribution at the time appellant made his principal advances.

In January, 1873, appellant, finding his means exhausted and his health failing, called upon the appellees for further financial aid. The result was that the advances of all the parties to the company were liquidated and settled, to that date, by the issue to all of them of additional stock, and to appellant the issue also of certain first mortgage bonds and a note of the company. Thereupon appellees assumed the active administration of the company's affairs, and began to make large additional advances of money. Matters continued thus until May, 1873, when the appellant's mental health having become seriously impaired, and the appellees having made very large advances, a consultation was held which resulted in a written agreement.

Before proceeding to the consideration of this agreement it may be well to dispose of a collateral matter. It is set forth in the bill that in January, 1873, " the plaintiff was not in the condition of mind to be able intelligently to protect his interests," and that on the 13th of May (the day of the signing of the agreement), " plaintiff's mind was so seriously affected that he was totally incapable of understanding any business matters whatever." It would be sufficient to say that these are mere obiter suggestions which are not made the ground for asking relief, and which might therefore be passed over as surplusage. No averment is made that any fraudulent advantage was taken of appellant's condition, or that any other or more beneficial arrangement was proposed for his interests, nor is there any prayer for the rescission or re-formation of the agreements. But it is proper to say that even now, with all the light that full investigation and subsequent developments give us, it does not appear what better arrangment for appellant's interest could have been made. The corporation was clearly insolvent if not bankrupt. Two courses only were

open ; either to wind up the corporate business at once and face the loss directly, or to go on and put more money in, with the hope of ultimate recoupment. By the former, appellant would occupy the position of a preferred creditor (and apparently the only one at that time) on first mortgage bonds for $50,000, and on general account for $51,000 on note; but, on the other hand, he had made himself personally liable to such an extent that if there should be a deficiency of assets on the liquidation, his whole private fortune was gone, and his right to any contribution from appellees at least doubtful. The appellees chose to go on, in the hope of a smaller loss in the future, if indeed they can be said to have had a choice at all. In the language of one of them, William Sellers, "it was our desire to sell the works, and close out, but we had so much invested that we could not afford to stop, provided we could go on and retrieve ourselves at all." From this course however, appellant, even if he had preferred it, was apparently barred by want of means, as well as by his condition of health. In this situation he accepted the agreement of the appellees to indemnify him from all further liability, and took his chances of ultimately saving something from his bonds and stock.

In making this agreement appellant was represented by his brother and son, and by his counsel, as competent, strenuous and indefatigable an adviser in complicated business matters as this bar could furnish, the late Chapman Biddle. The draft of the agreement is in his handwriting, and it would be difficult to convince any one who ever knew him professionally, that any point in his client's favor was either overlooked or surrendered without a full equivalent.

The allegations as to appellant's mental condition cannot therefore be taken as any part of the substance of the present bill, and the agreement of May 13, 1873, must be accepted as the foundation of the subsequent rights of the parties.

II. *The agreement and the respective rights of the parties under it.*

The agreement stipulated for two things, first, the assignment by appellant to appellees of all his stock, bonds and note of the corporation, and all his other property theretofore pledged for its debts; in consideration of which appellees indemnified him against all personal liability for the debts of the corpora-

tion, and all demands against him "arising out of his relation to or connection with the said steel works;" and secondly, appellant's bonds and note of the corporation, and his other pledged stock (not including his steel works stock), together with like amounts of the same or equivalent securities to be contributed by each of the other parties, were to constitute a "guarantee fund for paying the debts of the said works, other than the debts constituting or belonging to the said guarantee fund itself." And if there should be any surplus, it was to be devoted first to the return, in kind or value, of the outside stocks contributed by the parties, next to the parties in proportion to their company bonds and stocks in the fund, and lastly pro rata to all the stockholders of the steel works.

The intent of this agreement is perfectly clear. Appellant, who had been succeeded by Mr. Sellers in the presidency of the company three days before, retired from all participation in the conduct of the business, and surrendered the control of his stock and bonds to the appellees. In consideration therefor, he was indemnified from further liability, but retained his right to a share of the surplus, should there be any after settlement. On the other hand, appellees took upon themselves the conduct of the works, either to wind up or to continue, with unlimited control over the whole business and assets, including appellant's bonds, notes and stock, subject only to the restrictions as to the guarantee fund, and to the duty to indemnify and account.

The guarantee fund, except to the comparatively insignificant extent of appellant's Phila. Ins. and Safe Deposit Company stock previously pledged, and the stock of equivalent value which appellees were to furnish, was not a contribution of fresh capital. With that exception it consisted of claims against the company itself, and the effect of the formation of the fund was to create a class of deferred or subordinated claims, payment of which was to be postponed till all the other debts of the company had been satisfied. Some of the claims, possibly all of them, but especially the first mortgage bonds, were in such shape as to be capable of being used in payment or as collateral security for other debts, or for advances of money, if other creditors or capitalists could be found willing to take them for such purpose, and apparently such use was contem-

plated. But it did not prove practicable to any important extent, as according to the testimony of Wm. Sellers they could only be used as additional collateral with other securities, and were of little aid by themselves in raising money. The principal effect, therefore, of the guarantee fund was to lessen the amount of debts requiring immediate provision to meet. For this purpose appellant put into the fund and thereby deferred his claim upon bonds, etc., amounting in round figures to $107,000, and each of the other parties agreed to contribute, and thereby postpone, an equal amount. But it is entirely clear that this was the extent of the appellees' obligation to postpone their claims.

It was argued with great earnestness in behalf of appellant, and the learned master adopted the view, that the guarantee fund was not postponed to the claims of appellees for advances made prior to the date of the agreement, and therefore that no part of that fund could be used to repay such advances. The learned master enters into an elaborate consideration of the act of July 18, 1863, under which the steel works were incorporated, and finds that from neglect to file the annual statement of stock, assets and liabilities, etc., of the company, all of the parties were liable jointly and severally with appellant for the debts of the corporation. He then proceeds : " It therefore seems quite clear to me that at the time the agreement of May 13, 1873, was made, Mr. Huston and the defendants being joint owners of the works and of its assets, and directors of the corporation, who had neglected to comply with the act of July 18, 1863, they were jointly and severally liable to the creditors of the works for the payment of the debts of the corporation. And if one of them under that liability should pay more than his proportion, he could call on his fellow-members for contribution so as to equalize the payments.

" With this understanding let us consider to what extent the relation of the parties is changed by the agreement of May 13, 1873.

" The defendants, by that agreement, undertook to pay the debts of the steel works, then existing, to other creditors. It did not affect the rights of the parties, in relation to their claims against the steel works, for advances made for their use prior to the agreement ; nor did it give any of the parties an

advantage over the other, so far, as the assets which constituted the guarantee fund were concerned. As to those assets, each party having contributed an equal portion, all of the parties stood on equal terms. While the defendants had the management and control over the 'fund' for the payment of the debts due other creditors, they possessed no proprietary interest in Mr. Huston's contribution to the fund. The contribution was not made to benefit the defendants, but to pay or to secure other creditors; and the defendants possessed no power to make the guarantee fund answerable for their advances to the steel works prior to the period of the making of the agreement; nor, indeed, to make it answerable for any of their advances, even after the agreement was made, except to the extent of equalizing the excess arising from the property of one in the 'fund' being used to a greater extent than another's."

The difficulty with this view, and it is fundamental, is that it sets aside the agreement which the parties made for themselves, and substitutes an entirely different one, based on different considerations, and with wholly different results. Nothing is more dangerous than the so-called equity which undertakes to readjust rights or differences which the parties have settled for themselves, and in the absence of fraud or imposition, or such ignorance on one side as is equivalent to fraud on the other, nothing is more absolutely indefensible. No question as to outside creditors appears in this case, either then or now, and the discussion of the act of 1863 is wholly irrelevant. Whether appellees were then liable to outside creditors for the general debts of the company or not, or whether they were liable to appellant for contribution or not, was and is entirely immaterial. Appellant was by his own acts expressly liable to such creditors, and appellees relieved and indemnified him from such liability. That of itself was ample consideration for any rights appellees may have acquired under the agreement, even if the agreement had been open to question. But the parties having settled their rights themselves, no further discussion is permissible, and the agreement, according to the intention of the parties, must be carried out as the law of the case.

The language of the agreement is entirely clear. The guar-

antee fund is "for paying the debts of the said works, other than the debts constituting or belonging to the said guarantee fund itself." It is not to pay debts due to *other parties* than the contributors to the fund, but *other debts*, not constituting part of the fund itself. The language clearly refers to specific debts, not to the persons of the creditors who may hold them. In fact at that date appellant was a creditor, as already said, in the sum of $107,000, and that amount he postponed, as to payment, by putting it in the guarantee fund, and each of the other parties postponing his claims to the same extent, made up the fund of $321,000, by which amount the debts of the corporation urgent for payment were reduced, and the company to that extent freed from immediate pressure. As to any other debts due then, or subsequently incurred, the appellees (or the appellant if he had made subsequent advances), stood upon the same footing as any other creditors.

III. *What was done under the agreement.*

Appellees proceeded at once to the payment of the pressing debts of the works, and between the date of the agreement and the middle of September they had made fresh advances to the extent of $270,000.

The master reports that they did not comply with their agreement as to the guarantee fund, and if we regard the strict form of what was required, they certainly did not. No separate account was opened for the guarantee fund, nor were any bonds or notes or other corporation stocks specifically set apart for it. On the contrary, the bonds of appellant were very shortly after the agreement divided between the appellees, and transferred to their individual names. But the master's report rests upon the erroneous view, already discussed, that the guarantee fund could not be used to repay advances by the appellees, over and above their contribution to the fund itself.

At the date of the agreement Clark had advanced to the works $108,910, and the Messrs. Sellers $121,750. They might have put into the fund the bonds, etc., strictly as called for by the agreement, and immediately have taken them out again to pay these advances. But the business view of the matter was to regard these sums as their contribution in advance to the fund, and such in effect though not in form, they really were. Treating these advances as part of the guarantee

fund, and paying other debts by fresh advances out of their pockets, was the same as putting the fresh advances in the fund and then using the fund to repay these old advances, and this, as we have seen, they were entitled to do. Even the law which in general requires not only the right thing to be done, but also in the regular way, avoids useless circuity, and equity must certainly regard the action of the appellees as a compliance in substance with their agreement in this regard.

Appellees continued to operate the works, at first at a loss, but with a gradual improvement until the fall of 1880. There seems to be little doubt that all the parties at the time of the agreement expected the business to be wound up at an earlier date than this, but we do not find in the agreement or elsewhere any restriction upon the authority and discretion of the appellees in this respect. In this interval differences had arisen between the appellant and the appellees, and some litigation, which however, it is not material to discuss.

In the spring of 1880, the interest on the first mortgage bonds of the works being in arrear, suit was brought by Clarence H. Clark, a holder of some of the bonds as collateral for loans made to his brother, appellee Clark, and upon a decree of the Court of Common Pleas No. 3 of Philadelphia, the works were sold, October 30, 1880, to William Sellers for $450,000, and a new corporation called the Midvale Steel Company was immediately formed by the appellees, to continue the same business, with the same property, and at the same place. These facts and that the suit was brought with their knowledge and concurrence are frankly admitted by appellees, and constitute the gravamen of the appellant's case. He claims (par. VIII.—XIV. of the bill) that the foreclosure and sale were part of a scheme to oust him from the company, and that the parties being in the position of trustees for him, could not by any such acts discharge his interest in the works, and therefore that he is still entitled to the same proportionate interest in the new corporation that he had in the old.

IV. We have therefore to consider *the sale, and the duties of appellees in regard to it*, either to stop it, or to include appellant in the purchase and reorganization.

The sale was under process issued by the Fidelity Company, trustee, in the Court of Common Pleas No. 3. It was con-

firmed by that court, and the proceeds distributed by an auditor under its direction. No allegation is made of want of notice, or of any unfairness (other than the general purpose already referred to), or of inadequacy of price, and no application was at any time made by the appellant to the Court of Common Pleas, to set it aside or alter its terms. Under such circumstances the sale is not now open to question.

Nor is any allegation made in the bill that appellees should have stopped the sale. It is however argued that as the sale was only for non-payment of interest on the bonds, and as the profits of the works at that time produced sufficient funds to pay such interest, it was the duty of appellees as quasi trustees, managing the business for the benefit of appellant as well as themselves, to pay the interest and retain the property. Let us look at the situation. Appellees had as already shown, taken charge in the beginning of 1873 when the works were insolvent, and the appellant certainly, and perhaps appellees too, liable for very large amounts of the corporate debts. They had relieved and indemnified appellant from this liability, had advanced $270,000 within a few months to pay these debts, had carried on the works for several years at a loss, and now after a lapse of seven years, clearly a much longer period than any one had contemplated when the undertaking was begun, they had brought the works to a condition which was profitable in the sense of producing more than its working expenses (or, as the books express it, showing a profit on manufacturing account), but making no progress in the reduction of their debts. The works were going behind; says Mr. Wm. Sellers: "They never were able to make their interest. The interest on the debts always amounted to more than the profits. The manufacturing might show we made a profit, but when we came to close up the books that was all absorbed, and more too. We were going behindhand." Under the agreement of May, 1873, appellees had an absolute discretion to wind up the business at any time their judgment dictated. They were responsible only for good faith. After so earnest and so protracted a struggle to keep going, it would seem to be beyond question that it was a wise as well as an honest exercise of discretion to abandon the effort, and when the opportunity came or was sought by means of the sale, they were under no obligation not to seize it.

Were they under any equitable obligation to include appellant in the purchase and re-organization? This being a vital point in the relief claimed in the bill, it has been argued with great earnestness and ability by appellant's counsel, that the appellees were in such position as quasi trustees for appellant, that they could not buy at the sale of the common property to his exclusion. The principles of law are not disputed, but it is claimed with equal earnestness, that the facts do not warrant their application. A laborious examination of the testimony satisfies us that this position of the appellees is correct.

The situation in May, 1873, has already been stated, and the conclusion that the agreement of that date settled and determined the subsequent rights of the parties. That agreement clearly contemplated the absolute retirement of appellant from the business of the steel works. By it he was in terms relieved and indemnified from liability for their existing debts, and by manifest implication he was not to incur any new liability by anything that should be done in the future. The entire future management, and the resulting pecuniary responsibility, were upon appellees. All that appellant retained was a right to an account, and participation in any surplus that possibly might be left upon final settlement. That there would be any such surplus does not appear to have been thought probable. It is provided for in the agreement, but apparently more with a view to the disposition of the reserved or guarantee fund than to anything further. And all that I find in regard to it in appellant's testimony is where Dr. Charles Huston was asked, "Whether or not any statement was made by any of the defendants as to any benefit to be derived by the plaintiff in case the difficulties then surrounding the company should be removed," and he replied, "If there was anything left after paying the debts, it was understood by all, I think, that they should share in proportion to their ownership." The testimony of appellees on this point is very positive. "I am very sure," says William Sellers, "that either of us would have been willing to go out of the concern if we could have found anybody who would have relieved us from the responsibility of the concern at the time. I know so far as I am concerned I would have done it, and so stated at the time, that if anybody would

relieve me of the debts of the concern I would be very glad to give up everything I had in it." In accordance also with the idea that appellant was out of the business, is the admitted expectation of all the parties that the business would be speedily wound up. Thus, in the examination of Dr. Huston: "Q. You have stated that the agreement of May 13, 1873, was executed with a view to the immediate sale of the works? A. As soon as a purchaser could be found. Q. Please state whether anything was said as to an indefinite carrying on of the business after the execution of that agreement? A. I have no recollection of that being in contemplation under any contingency." And again, William Sellers on cross-examination says: "It was contemplated that it should be wound up, but it was also contemplated that we should carry it on if we could not wind it up. . . . . It would have been our choice to wind up, but we did not have the option."

The conduct of the parties was in accordance with this view. The works were carried on by appellees as already stated, at a loss for two years and a half, without calling on appellant for contribution, and when in the letters that passed between the parties in the fall of 1875 appellees suggested that they had carried a heavy burden, and asked if appellant could not now do something to assist, the only result seems to have been a rather angry interview the substance of which is contained in the statement of appellant himself: "If I was to do anything I would sell out my entire interest." From this time forward the relations of the parties became more and more antagonistic, litigation ensued as already stated, and by the time of the sale in the fall of 1880 the positions of the parties were openly hostile. Appellant could not have been deceived on this point, nor induced to slumber on his rights, under any impression that his interests would be identified with those of appellees. He had notice of the sale and the contemplated purchase. He knew that the latter meant the continuation of the business with the contribution of fresh capital, as well as the application of the old plant. The business had hitherto been unsuccessful, and might still be so. Even the promise of profit that it gave, was based on the sinking of more than a quarter of a million dollars of appellees' advances to the guarantee fund. Appellant had also a share in that fund, and he knew it would

be sunk like the rest, unless recouped by the new start. He had been free from the liabilities of the business for seven years and a half, and he knew that the others meant to treat him as permanently out. Then was his time to speak, to come forward and assert his right, and proffer his contribution to the new venture. He did nothing, and as already seen, he does not even now question the propriety of the sale or the adequacy of the price. He has no equity now, after the labor' and capital of the appellees have made the new venture successful, to claim a share on the ground that they were his trustees. The agreement of 1873 gave them the right to manage the works according to their own judgment, subject only to the duty to account. On a full review of the facts we are clearly of opinion that they were justified in considering the appellant as out of the business, and were under no obligation to include him in the new undertaking; and that even if these points were doubtful, appellant by allowing them to go on and engage in a venture to which he contributed nothing and had no liability, estopped himself from claiming a share, now that it has proved profitable.

It may still be however that appellant would have an equitable interest in the new company, if his bonds or other securities were used in payment of the purchase of the plant of the old works. The learned master was of this view, but it was based on the liabilities of the parties under the act of 1863, and his construction that appellees were not entitled to use the guarantee fund to repay their previous advances. " The conclusion seems to me irresistible," he says, " that every bond which the defendants took by the payment of the debts of the steel works, they received for the joint account of themselves and Huston." This construction of the rights of the parties under the agreement of May, 1873, has already been discussed, and as we are unable to concur in it, we are of course unable to accept this mode of reaching the conclusion that appellees paid for the property with the bonds of appellant, and must look into the facts as they actually occurred. As already said the course taken by appellees was not according to the strict tenor of the agreement. Instead of establishing the guarantee fund, as called for, and keeping it separate until the final liquidation, they took the business view, and did what they considered equiva-

lent. So far as regards their own contribution to the fund, this has been already discussed, and found to be a substantial compliance with their agreement. With regard to the appellant's bonds, etc., it appears that soon after the agreement, they were divided between the appellees and formally transferred to their separate names. What the exact purpose of this action was, whether as part of the means of repaying appellees' advances, or for convenience in using the bonds as collateral for the large loans which appellees were likely to require, does not clearly appear, nor is it perhaps now material to inquire. Appellees from time to time repaid their advances by the issue of other bonds of the same kind, and at the time of the sale were the owners in their own right of practically the whole issue except appellant's fifty which stood in their names. Whether they were the real owners of these depended on the state of the guarantee account.

By the terms of the sale the purchase money was payable in cash, or, at the option of the purchaser, in the bonds secured by the mortgage under which the sale was made. By arrangement with the other holders all of such bonds then outstanding except the fifty that had belonged to appellant were presented by Mr. Sellers before the auditor, and allowed directly as part payment of his purchase money. The fifty bonds of appellant, contributed to the guarantee fund, were not used in payment, but were presented for a cash dividend which was allowed as cash to be paid out of the purchase money to Clark and the Messrs. Sellers. No cash actually passed on this account, and even if it had it would have made no difference, for a payment of cash immediately repaid as a dividend on the bonds, would in equity have to be treated as in substance the same as payment directly with the bonds themselves. We must therefore look to the substance of the payment, and doing so we find that appellees' own bonds were far more than sufficient under the terms of the sale to pay all the purchase money. The bonds represented a par value, available as purchase money, of $449,000, as principal alone, and over and above this was interest amounting to about $168,000 more. The number of bonds presented, therefore, merely affected the dividend that would be payable on each. The appellees, had they chosen, might have entirely omitted to present appellant's fifty bonds for

any purpose. But in that case, as those bonds were part of the guarantee fund, they would have to be accounted for in the settlement of that fund, and appellees would have been chargeable in such settlement with the dividend to which the bonds would have been entitled out of the purchase money. Appellees, therefore, apparently recognizing the obligation to account, liquidated the dividend by presentation of the bonds, and receipting as for so much cash received upon them. This was the receipt of so much on account of the guarantee fund, which must be accounted for in the final settlement, but it cannot be regarded as the use of appellant's bonds in the payment of the purchase money of the works.

In paragraph IV. of the bill mention is made of twelve other bonds issued in the name of appellant. No basis or reason of issue is however stated in the bill, but in the answer it is averred that they were issued as collateral for notes indorsed by appellant, which were subsequently assumed and paid by appellees. It therefore appears that appellant had no absolute interest in them, and they may be dismissed from further consideration.

The steel works enterprise appears to have been unprofitable from the start, the losses to all the parties serious, and to the appellant, disastrous. Appellees through the fortunate possession of greater means and better health and working ability, have been able to rescue themselves and establish a successful business ; but on a careful review of all the facts we do not find that they have attained success by any disregard of appellant's rights, or that they are responsible for the unfortunate result to him. There is therefore no ground on which he can be held entitled to any interest in the present company.

V. There remains to be considered only the question of accounting, and this we find the least satisfactory presentation of the case.

Under the agreement of May, 1873, appellant is entitled to an account of the guarantee fund, and as the equitable owner of stock, to a general account up to the time of the sale and closing of the steel works. Owing to the different views we take of the principles on which the account should be made up, we do not find the master's statement of much use. The opinion of the court below says that " all the property received by

the defendants under the agreement . . . . . has been fully and correctly accounted for," but unfortunately, from its extreme brevity, does not refer us to the evidence on this point. A great mass of figures, much of it entirely irrelevant, is presented in the testimony of the book-keeping experts, Heins and Burke. Possibly all the necessary materials are there. Indeed we gather from the general tenor of the argument that on the basis, which we hold to be correct, that appellees were entitled to apply the guarantee fund to the repayment of their own advances in excess of their proportionate share of such fund, it may probably be conceded that the guarantee fund was exhausted, and if so there is nothing due to appellant. But we nowhere find the guarantee fund account, or the general account, stated in such direct, explicit and unmixed shape as enables us now to say with certainty that that result must follow. An account is admitted by appellees to be due, and is tendered in paragraph XII. of the answer. It is also referred to in the examiner's report as being present in the witness's hand, but we have not been able to find it printed, unless what is meant is the mass of figures already referred to as presented by the witness Burke. This is much too long, too involved and too full of irrelevant and speculative matters to be satisfactory. The account required is capable of presentation within very small compass, and need contain but few items, though some of the items may involve labor in the examination of books, etc., and a few may be open to conflicting evidence. Appellees should charge themselves first, with the assets, real and personal, received when the works passed into their hands, and secondly, with the moneys received from the works, from time to time during their management, including the balance of profit on manufacturing and other accounts, if any, the cash dividend from the purchase money of the plant, received on the fifty bonds derived from Huston, and any other sums of money received, and not included in the foregoing or other specific items. As to the first item, the price approved by the court, $450,000, is a conclusive valuation for everything properly included in the sale. The value of the personal property not so included, may be open to question, though the appellees may in the first instance rest on the prima facies made by the sale for $301,334.63 of what appellant in his bill values at $250,000.

41

On the other side of the account appellees are entitled to credit for all moneys paid out on account of the works (including their own advances from January, 1873, in excess of their contribution to the guarantee fund), interest account, balance of losses on repair, machinery, tool, and other accounts, if any, etc., etc.

To such an account appellant is entitled, and, much as it is to be regretted that this long controversy should be further protracted, we are compelled to afford appellant the opportunity to have such account, if upon consideration of the principles on which it is to be stated, as herein determined, he shall deem it worth while to pursue the case further.

> Decree reversed, bill reinstated, and record remitted for an account upon the principles of the opinion filed.